<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SEVILLE GRANT,<br><br>                  Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner<br>of Social Security,<br><br>                  Defendant. | Case No.:  2:17-cv-03982 (PAZ)<br><br>**OPINION** |

**APPEARANCES:**

AGNES S. WLADYKA
AGNES S. WLADYKA, LLC
122 ROUTE 22 WEST
MOUNTAINSIDE, NJ  07092
      On behalf of Plaintiff

EVELYN ROSE MARIE PROTANO
SPECIAL ASSISTANT U.S. ATTORNEY
C/O SOCIAL SECURITY ADMINISTRATION
OFFICE OF GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA 19101
      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Seville Grant for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.).

Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the

application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court affirms the Commissioner's decision that was Plaintiff was not disabled.

## I.    PROCEDURAL HISTORY

On August 23, 2013, Plaintiff filed an application for DIB alleging a disability onset date of November 4, 2010.  (R. 198-99.)[2]  On October 16, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 67.)  Plaintiff filed for reconsideration, and the application was again denied on February 10, 2014.  (R. 78.)  On November 18, 2015, an Administrative Law Judge held a hearing on Plaintiff's application at which Plaintiff was represented by counsel.  (R. 26-66.)  On December 7, 2015, the ALJ issued a decision denying Plaintiff's application.  (R. 10-25.) On May 4, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-5), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.

On June 2, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3).  ECF No. 1.  On May 8, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  In April 2018, Ms. Berry resumed her role as Acting Commissioner.  *Patterson v. Berryhill*, No. 18-cv-193(DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); *see* 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 7.

U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 14.[3]  The case was

reassigned to the undersigned Magistrate Judge on September 28, 2018.

## II.   LEGAL STANDARD

### A.   <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ

in reviewing applications for Social Security disability benefits.  *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are

supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42

U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and

internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018

WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a

preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*,

354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL

1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be

set aside merely because the Court "acting de novo might have reached a different conclusion."

*Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*,

247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

evidence, we are bound by those findings, even if we would have decided the factual inquiry

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the
Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at \*4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at \*3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at \*4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at \*4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));

*see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of

the evidence s/he considered which supports the result, but also some indication of the evidence

which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ

may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which

[s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186

F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation

for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."

*Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative

evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award

benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

**B.    Standard for Awarding Benefits**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §§ 404.1505(a), 416.905(a).[4] An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id*. §§ 404.1521, 416.921.

---

[4] Although the standards for disability are the same under Title II (42 U.S.C. §§ 401, et seq.) and Title XVI (42 U.S.C. §§ 1381, et seq.) of the Social Security Act, these are separate government programs subject different qualification requirements.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id.* §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id.* §§ 404.1572(a) & (b), 416.972(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations. *Id.* §§ 404.1522, 416.922. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id.* §§ 404.1560, 404.1565, 416.945, 416.960. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id*. §§ 404.1569a(a) & (b), 416.969a(b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching; difficulty tolerating physical features of certain work settings such as dust or fumes; or difficulty maintaining concentration or understanding detailed instructions. *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience, and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform

substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. §§ 404.1569a(d), 416.969a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. §§ 404.1569a(c), 416.969a(c).

## III. ALJ DECISION AND APPELLATE ISSUES

Plaintiff was forty-two years old on the alleged onset date (November 4, 2010) and meets the insured status requirements of the Social Security Act through December 31, 2019. (R. 15, 19.) At Step One, the ALJ found that Plaintiff engaged in substantial gainful activity for the period between January and December 2013. (R. 15.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: status post right tibia fracture and hepatitis C infection. The ALJ also found at Step Two that Plaintiff had the following impairment that was not severe: polysubstance abuse. (R. 15.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 16.) At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work subject to various postural limitations. (R. 16.) The ALJ also found at Step Four that Plaintiff was unable to perform her past relevant work as a store clerk, school bus monitor, van driver, counselor, or cashier. (R. 18.) At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 202.21 if Plaintiff had the RFC to perform the full range of sedentary work. The ALJ also found at Step Five that at least 3 jobs – election clerk (DOT #205.367-030), address clerk (DOT #209.587-010), and document clerk (DOT # 249.587-018) – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC. (R. 19.) The ALJ concluded

that Plaintiff was not disabled at any time between the alleged onset date and the decision date (December 7, 2015).  (R. 20.)

Plaintiff contends that the ALJ committed four reversible errors:  (1) at Step Three, the ALJ "makes a conclusory statement that plaintiff does not meet or equal a listed impairment without explanation" (ECF No. 15 at 12; *see id*. at 13-15); (2) at Step Four, the ALJ's assessment of Plaintiff's subjective symptoms is not supported by substantial evidence (*see id*. at 15-17); (3) also at Step Four, the "ALJ's RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence" (*id*. at 18); and (4) at Step Five, the hypothetical questions presented to the VE do not "accurately portray [her] physical and mental limitations" (*id*. at 18-20).[6]  Plaintiff asks the Court to remand for payment or, alternatively, for a new hearing. Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.    SUMMARY OF RELEVANT EVIDENCE

### A.    <u>Medical Evidence.</u>

Plaintiff most recently worked as a chauffeur.  On November 4, 2010, she was struck by a car when getting into her vehicle and then transported by ambulance to the emergency room at UMDNJ University Hospital.   On November 5, Dr. Robin Gehrmann (orthopedic surgery) performed an irrigation and debridement of a right open tibial fracture, which included bone, soft tissue, and muscle; intramedullary nailing of the right open tibial fracture; and application of an antibiotic bead pouch.  Plaintiff's post-operative diagnoses was right Grade IIIB right open tibia

---

[6] The Court notes that Plaintiff's third and fourth arguments both rely on the same alleged error, that the ALJ's Step Four RFC finding fails to include all credibly established limitations.  *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005).

and fibula fractures; complex laceration of the left leg greater than 30cm; severe muscle loss of the superficial and deep posterior compartments of the right leg; and a laceration of the posterior tibial artery that was not repairable.  On November 6, Dr. Kathleen Beebe (orthopedic surgeon) performed an incision and drainage of the right open tibial fracture with antibiotic beads removal and placement of a new antibiotic beach pouch in the right open tibial fracture.  On November 8, Dr. Frank Liporace (orthopedic surgeon) performed an irrigation and debridement and application of a wound vac.  On November 10, Dr. John Capo (orthopedic surgeon) performed an irrigation and debridement of the open wound and added a rotation soleus flap.  On November 12, Dr. Capo performed a split thickness skin graft to cover the soleus muscle flap.  On November 15, Plaintiff was discharged from the hospital on crutches.  (R. 309-37, 351-491.)

On her release from the hospital, Plaintiff was treated by Drs. Capo, to manage her soft tissue, and Dr. Liporace, to manage her fractured bones.  On November 24, 2010, Dr. Liporace reported that cannabinoids, opiates, and alcohol were identified in Plaintiff's laboratory work, and that she had gone through her narcotic pain medication very quickly.  He prescribed Ultram and referred her to Dr. Andrew Kaufman (anesthesiologist) for pain management.  (R. 339, 492.)  In December 2011, Dr. Kaufman opined that Plaintiff had moderate hyperalgesia in the distribution of the posterior tibial nerve and prescribed a Duragesic patch every 3 days, Neurontin every 8 hours, and Nucynta as needed.  (R. 339.)

On January 10, 2011, Plaintiff tested positive for THC and Oxycodone in a drug screen performed by Dr. Kaufman.  (R. 339.)  On January 19, 2011, Dr. Liporace reported that Plaintiff was still wearing a CAM walking boot and was very apprehensive about bearing weight on her right leg even though she had been going to physical therapy.  Plaintiff stated that she had lost 40 pounds and felt that the resulting weakness and lack of stamina hindered her physical therapy.

12

Plaintiff also stated that her pain had decreased in the right leg, and that she was seeing the pain management doctor. Dr. Liporace instructed Plaintiff to wean from the CAM walking boot, and she was given a post-operative shoe for ambulation around the house. He also recommended that Plaintiff schedule a general medical evaluation regarding her weight loss and fatigue. (R. 495.) On January 31, Plaintiff again tested positive for THC and Oxycodone in a drug screen performed by Dr. Kaufman. (R. 339.)

On March 2, 2011, Plaintiff advised Dr. Liporace that she had been discharged from Dr. Capo's care. She also advised that she had been discharged from Dr. Kaufman for illicit drug use. Plaintiff stated that she was in considerable pain and was only doing home therapy. Dr. Liporace referred Plaintiff to Dr. Younclas (physiatrist) for pain management and drug counseling; prescribed outpatient physical therapy; prescribed a walking cane to assist with ambulation; and counseled her on the importance of smoking cessation. (R. 499.)

On April 27, 2011, Dr. Liporace reported that Plaintiff's former case manager had not sent her to Dr. Younclas. Plaintiff was instead sent to a different pain management doctor who would not treat her. Nor did the case manager refer Plaintiff to a primary care provider who could assist with smoking cessation. Plaintiff stated that she was unable to undergo physical therapy because of her pain level. X-rays revealed no hardware failure and no specific gross loosening, but no significant healing since the last visit. Dr. Liporace advised Plaintiff's new case manager that, for him to continue treating Plaintiff, she needed to see Dr. Yonclas, attend physical therapy, and stop smoking. (R. 500.)

Also in April 2011, Plaintiff was evaluated by Dr. Jonathan Leafer (physiatrist) – by request of Plaintiff's insurance carrier – for a second opinion regarding ongoing pain management and medications. Plaintiff complained about numbness in her legs; smoked 5-6 cigars per day;

adamantly denied any drug or alcohol disorder; and was noncompliant with physical therapy, claiming she cannot attend without a prescription of additional opiate medications.  Dr. Leafer reported:

> The patient is seen sitting in the examination chair.  She does not appear to be in any significant discomfort or distress.  There are well healed soft tissue and surgical scars in both lower extremities.  Motor examination is nondiagnostic with very poor effort and give way weakness with testing of the quadriceps and ankle dorsiflexors and plantar flexors bilaterally.  Pin prick is intact in areas not affected by surgical scar or soft tissue defect.  Reflexes are trace and symmetric at the knees and absent the ankles.  The feet did not show any discoloration, temperature or sweating abnormalities or other dystrophic changes.  Palpation of the legs and feet does not appear to elicit any significant discomfort.

He opined:

> This patient is status post a significant crush injury to the lower extremities requiring numerous surgical procedures.  The wounds appear well healed at this point.  There is no evidence of complex regional pain syndrome.  Unfortunately her various urine drug tests results from the initial hospitalization to the present appear to clearly document an underlying Oxycodone and THC addiction.  It appears she's been self-medicating with Oxycodone throughout her treatment.  When I calmly and politely pointed out this to her she became very argumentative and denied any problem.  Clearly attempts by the other providers to get her to recognize her substance abuse disorder have not yet been successful.  At this point she is not being prescribed any opiate medications and in my opinion she is not a candidate for any further treatment with opiate medications.  Unfortunately, she is very uncooperative and it is difficult to assess to what extent objectively she may benefit from ongoing use of the Gabapentin.  In my opinion any additional participation in physical therapy should not be contingent on the patient receiving opiate medications.  Therefore from a pain management standpoint she is at maximal benefit of treatment.

(R. 344-47.)

In May 2011, Plaintiff was evaluated by Dr. Gregory Gallick, who reported diffuse numbness in her foot and minimally decreased range of motion of the ankle with some mild tenderness about the middle third of the tibial region.  He opined that Plaintiff needed a fibula osteotomy, intramedullary rod dynamization, removal of two distal locking screws, and a local

bone graft.  He also opined that Plaintiff was not a candidate for any pain medicine or physical therapy until the fractures healed.  He also recommended a bone healing stimulator.  (R. 339-40.)

In early June 2011, Plaintiff began treatment with Dr. William Oppenheim (orthopedic surgeon).  He agreed with Dr. Gallick that the tibial rod should be dynamized; that a small piece of the fibula should be removed; and that a bone healing stimulator would be helpful.  Dr. Oppenheim did not agree that any distal locking screws should be removed, nor did he agree that Plaintiff required either a bone graft or a short leg walking orthosis.  Dr. Oppenheim recommended that the dynamization procedure be performed same day, with a post-operative block, and one Percocet prescription.  He also recommended that Plaintiff continue to take Gabapentin.  He further recommended that Plaintiff enter a physical therapy program in conjunction with ongoing healing to address her significant gait deficit.  In mid-June, Dr. Oppenheim performed a partial fibulectomy and removed two proximal screws.  At the end of June, Dr. Oppenheim reported that Plaintiff "has been ambulating with a cane at this time with her reporting some degree of discomfort however less than the last visit.  She has also noted a small amount of swelling.  No setbacks were appreciated."   X-rays revealed that the fractures were not yet fully healed.  Dr. Oppenheim removed the sutures from the fibulectomy and performed a screw removal procedure, and he noted that Plaintiff "will be continuing with her ambulatory efforts."  (R. 512-16.)

In July 2011,  Dr. Oppenheim reported that Plaintiff "has continued with her ambulatory efforts with her reporting pain about the bare area of the tibia and some slightly laterally.  She does not report the level of bone pain that she previously had and is definitely ambulating better than she previously did."  X-rays revealed that the fractures were not yet fully healed.  Dr. Oppenheim noted that Plaintiff "is going to begin a physical therapy program under the direction of David Acocella."  (R. 511.)

In August 2011, Dr. Oppenheim reported that Plaintiff "has continued with her ambulatory efforts. She does report some pain with ambulation over the bare area of the tibia at the region of her fracture of the tibia as well as some about the anterior aspect of the ankle." X-rays revealed that the fractures were not yet fully healed. Dr. Oppenheim noted that arrangements were made for Plaintiff to attend physical therapy under the direction of Strulowitz & Gargiulo. (R. 509-10.)

In September 2011, Dr. Oppenheim reported that Plaintiff experienced "some degree of improvement" working with Strulowitz & Gargiulo, but she still had "some pain within the medial joint line of the knee as well as some about the patella femoral joint." He noted that she was not using a cane. X-rays revealed evidence of progression of healing of the fibula fracture; and appreciably more healing posteriorly, anteriorly, and laterally of the tibial fracture, with still some visibility noted medially. Since Plaintiff demonstrated evidence of inverting with ambulation, she was provided a lateral shoe wedge that facilitated appreciably better ambulation. Dr. Oppenheim instructed her to continue physical therapy and utilize the wedge. (R. 508.)

On October 18, 2011, Dr. Oppenheim reported that:

[S]he has continued with her physical therapy with her reporting feeling better than she previously did. She is ambulating without the use of any assisted devices with her demonstrating some but less in-toeing. She does still have slight in-toeing on the right side. She also does report some endurance issues. She does feel that the therapy has been beneficial to date. She does not report the complaints with regard to her tibia as previously document.

X-rays revealed: the tibial fracture was filling in and well healed through 75-80% of the circumference, with a small area of healing still occurring at the direct medial aspect; the fibula fracture was well healed; and the partial fibula resection area was developing some calcification. Based on physical examination findings, Dr. Oppenheim opined that Plaintiff "could return to work light duty with her not being on her feet for more than two hours in an eight hour day and

this had to be broken up." He also opined that "she could not ambulate with more than 20 pounds." (R. 507.)

> On November 15, 2011, Dr. Oppenheim reported:
>
> [S]he has returned to work with her working driving a shuttle two hours per day. She does report some increased pain about the distal screw heads as well as the rod insertion site and some around the area of the fracture site. She has been attending physical therapy under the direction of Strulowitz and Gargiulo with improvement from this being noted.

X-rays of her tibia revealed that the original fibula fracture was healed; the fibula osteotomy was filling in; and the tibia was "definitely" healed laterally as well as anteriorly and posteriorly with minimal demineralization noted. Based on physical examination findings, Dr. Oppenheim opined that Plaintiff should continue with physical therapy and working light duty. (R. 506.)

On January 10, 2012, Dr. Oppenheim reported that Plaintiff had been hospitalized in December with pneumothorax and had not yet been cleared for physical activity. Plaintiff complained about some shortness of breath doing a significant amount of activity and weakness. X-rays of her tibia revealed that it was circumferentially healed and that the fibula resection area was also filling in with bone. Based on physical examination findings, Dr. Oppenheim opined:

> On this date it was my feeling[] that she was at a level where she has reached her maximum medical benefit. She does not require any additional treatment for the previous diagnosis of a non-union. Her diagnoses with regard to weakness was not clearly supported. She also is in a position presently where she is not able to participate in any exercise. Under those circumstances she will be considered at maximum medical benefit and if she does require any additional treatment she will recontact the office when she is done with her treatment for her diagnosis of lung collapse.

(R. 504-05.)

On January 17, 2012, Dr. Oppenheim opined that Plaintiff "has appreciated healing of her tibial fracture and with regard to this injury of November 4, 2010 she can perform the duties and responsibilities as well as meet the physical requirements to be a chauffeur." (R. 503.)

In October 2013, Plaintiff was evaluated by Dr. Betty Vekhnis (physiatrist). Plaintiff complained of pain in her legs (mostly left knee and left ankle) – for which she took Tylenol as needed – and difficulty standing and walking. She also stated that she had lost 15-20 pounds within the last year. Dr. Vekhnis reported that Plaintiff walked into the office with a straight cane but was able to walk in the office without an assistive device. Plaintiff's left leg was slightly shorter, and she was unable to walk on heels and toes but was able to squat shallow. Physical examination findings were normal for the cervical spine and lumbar spine, and were reported as follows for the extremities:

> Examination of the upper extremities showed full ranges in shoulders, elbows, wrists, and hands. No sensory loss, no focal weakness.
>
> Examination of the lower extremities showed non tender range in hips, right knee was non tender, right leg had distorted anatomy, with evidence of calf muscle transfer and skin grafting, decreased sensation in the distal leg, full range in the right ankle, decreased strength in ankle dorsiflexors and EHL [extensor hallucis longus muscle], and left leg showed surgical incisions and scarifications, range was full in knee and ankle, no focal weakness, sensory examination was normal.

X-rays of Plaintiff's right tibia and fibula revealed status post prior trauma with healed fractures of the tibia and fibula, and status post internal fixation of the tibial fracture. Dr. Vekhnis's "impression" was that Plaintiff had "a history of bilateral ORIF [open reduction and internal fixation surgery to fix broken bones] distal legs, mild leg length discrepancy, muscle weakness right lower extremity, no foot drop. She has normal functions of hands for fine and gross motor manipulations. She benefits from the use of an assistive device for ambulation." In a Passive Range Of Motion Chart also dated October 10, Dr. Vekhnis opined that Plaintiff: had full bilateral grip and pinch strength in her hands; could separate papers and button buttons with her hands; and no range of motion limitations with her upper extremities; could walk at a reasonable pace; used a

prescribed cane to lean on for support during long walks; and had effective use of at least one upper extremity for carrying while using the cane. (R. 517-21.)

In February 2014, State Agency consultative examiners concurred on reconsideration with the Agency's October 2013 opinion that Plaintiff had the residual functional capacity to perform a narrow range of light work. Specifically, Plaintiff could: occasionally lift/carry up to 20 pounds; frequently lift/carry up to 10 pounds; stand and/or walk (with normal breaks) for a total of 3 hours in an 8-hour workday; sit (with normal breaks) for a total of 6 hours in an 8-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. (R. 68-77, 79-89.)

Beginning in May 2015, Plaintiff was treated for hepatitis by Dr. Douglas A. Taylor (infectious diseases) and Velma Frasier (nurse practitioner). On May 20 and June 30, Plaintiff complained about joint pain, but physical examination findings included normal gait; normal range of motion in all joints; normal sensation; normal strength; no edema, swelling, or deformity; and normal coordination. On July 21, Plaintiff complained about numbness and tingling in her lower extremities and hands, but physical examination findings again were normal. Plaintiff was prescribed Gabapentin and referred to Dr. Howard Kuo (neurologist). On August 19, Plaintiff complained about chronic lower leg, back, and joint pain, but physical examination findings were normal. She was referred to Dr. Kris Homb (pain management). (R. 522-54.)

In September 2015, Plaintiff underwent a physical therapy evaluation at St. Barnabas Health/Newark Beth Israel Medical Center on referral from Dr. Homb for bilateral osteoarthritis of the hips. She complained about intermittent bilateral hip pain (rated 5/10) and weakness after her 2010 accident; she also reported some bilateral numbness in her lower legs. The hip pain and weakness caused difficulty using stairs, standing from a seated position, and walking long

19

distances.  Physical examination findings included mild antalgic gait, independent ambulation without assistive device; bilateral hip range of motion within functional limits; and bilateral muscle strength rated 3-4/5.  Plaintiff attended three physical therapy sessions in September, two in October, and two in November 2015.  By November, Plaintiff reported that exercise made her move and made her muscles stronger.  (R. 555-61.)

Also in September 2015, Plaintiff listed her current medications as Harvoni (hepatitis), Acyclovir (hepatitis), Gabapentin (neuropathy), Meloxicam (chronic pain), and Nortriptyline (arthritis).  Plaintiff indicated that Harvoni, Acyclovir, and Gabapentin were prescribed by Dr. Taylor, while Meloxicam and Nortriptyline were prescribed by Dr. Homb.  (R. 293.)[7]

**B.    Non-Medical Evidence.**

**1.    Plaintiff's Function Reports.**

In September 2013, Plaintiff submitted a Function Report advising that she lived in an apartment with family and cared for her daughter.  She experienced sharp pain in her legs; had to sit to dress herself; did not prepare meals because she did not cook; spent about 5 minutes washing dishes; went outside everyday and could get out alone; traveled by driving a car or as a passenger; spent about 20 minutes shopping in stores for food and toiletries; could handle her own finances; and visited with friends twice a week, occasionally going to the movies.  She had difficulties with lifting, squatting, bending, standing, kneeling, stair climbing, sitting, and walking.  She could lift to 30 pounds.  She could walk 3 or 4 blocks before needing to rest for 5-10 minutes.  She could pay attention for a long time, finished what she started, and followed both written and spoken instructions well.  She could handle stress and changes in routine well, and she got along well with

---

[7] There are no treatment records from Drs. Capo, Kaufman, Young, Kuo, or Homb, nor are there physical therapy records from Mr. Acocella or Strulowitz & Gargiulo.

authority figures.  She used a cane and eyeglasses.  Both were prescribed by her doctor "during [her] recovery."  (R. 250-57.)

In January 2014, Plaintiff submitted another Function Report that was consistent with her previous report except as follows.  She experienced cramps, spasms, and burning sensations in her legs.  She had no problems with personal care activities; spent 2 hours once a week preparing simple meals; sometimes did light laundry and ironing; and went to dinner with friends twice a month and to church.  She could walk 2 blocks before needing to rest for 5 minutes.  She could handle stress "so so" and changes in routine "okay."  She used a cane every day; the cane was prescribed at the "time of accident."  (R. 267-74.)

### 2.    Plaintiff's Hearing Testimony.

During the November 2015 hearing, Plaintiff testified in response to questioning from her counsel and the ALJ.  (R. 31-59.)  The ALJ summarized Plaintiff's testimony as follows:

> [T]he claimant testified that she is 48 years old with a 12th grade education.  She stated that she suffered from hepatitis C and bilateral leg disorders.  As a result of these impairments she stated that she cannot lift heavy weight.  It is difficult for the claimant to stand or walk for long periods.  She is often fatigued.  She has difficulty sleeping.  She takes medication to lessen the impact of the symptoms, but her condition still limits her activities.

(R. 16.)  The Court notes the following additional testimony:

- Plaintiff lives with her adult daughter in a first-floor apartment and receives public assistance, a rental subsidy, and food stamps.  She can drive occasionally to local destinations, more so on weekends when there is less traffic.  She can shower and dress; she cooks about once a week, like a Sunday meal; she does laundry but does not sweep or mop; and her daughter shops for her.  She goes to church once a month.  During the day, she sleeps and watches television; she does not use a computer.

- Plaintiff testified that her pelvis is her most severe or most limiting problem, and that she has had pelvic pain since the accident in November 2010.  She experiences shooting, stinging pain and spasms in her feet, and she has pain in her hips, knees, and ankles.  The pain is constant, and worse during extreme weather.  Her dominant left hand also cramps up sometimes, and she lacks strength in that hand.  She was

diagnosed with hepatitis C in February or March 2015 when her insurance "kicked in," and she is treated by Dr. Taylor. She goes to physical therapy twice a week for her hip that sometimes helps; she has a pain management doctor named Dr. Homb; and she has a primary care physician for "other issues." Her current medications included Acyclovir and Harvoni (hepatitis) and Gabapentin (neuropathy). She initially testified that these medications cause fatigue as a side effect, but then testified that the fatigue comes from the pain that she experiences trying to walk. Her overall condition has not improved at all since November 2010.

- On a typical day, Plaintiff goes to bed around 9pm and awakens at 5am. She sometimes has insomnia when she wakes up at 2am and cannot fall back asleep. She thinks the insomnia is caused by her pain, her medication, and menopause. She naps 4-5 hours during the day.

- Plaintiff can sit for about 2 hours "on and off" before she must lay down. When she stands, she experiences cramps in her hips and knees after 30 minutes. She can walk for half a block before needing to stop for a break. She uses a handheld cane most of the time. She cannot pick up and carry more than 5-10 pounds for a short distance. She cannot bend or climb stairs. She spends about 8 days in month in bed all day.

- Plaintiff responded "no" when asked by the ALJ whether she has any issues or difficulties with substance abuse, either alcohol or drugs. After Plaintiff's counsel concluded her questioning, the ALJ asked Plaintiff to explain the discrepancy between her testimony and the record evidence both that she tested positive for THC, alcohol, and opiates when admitted to the hospital in November in 2010, and that she was subsequently discharged from pain management because her toxicology was positive for THC and Oxycodone. Plaintiff responded: "That's not a discrepancy. I had a joint, which I smoked, and I had a bottle of beer." She stated that she has not had any alcohol or drugs since then.

- When asked by the ALJ to describe her employment since November 2010, Plaintiff responded that she used to help "every once in a while" in her daughter's candy shop. When questioned about her 2011 and 2012 tax returns, which reported self-employment income from "transportation," Plaintiff responded that she worked as an aide for her daughter's friend's business. The job involved monitoring children while they were transported by van or bus between home and daycare. Plaintiff testified that she currently worked as an aide 12 hours a week, earning $200 off the books every two weeks. During questioning by her counsel, Plaintiff testified that she stopped working in early 2015 because of her pain.

### 3. Plaintiff's Employment History.

On September 13, 2013, Plaintiff completed a Work History Report indicating that her most recent three jobs were with Empire (driving clients to/from airports), Rapid Respond (driving

clients to/from medical appointments), and Pegasus (for "school bus charters").  Plaintiff did not

provide corresponding employment dates for these positions.  (R. 242-49.)  Plaintiff's Workers'

Compensation paperwork indicates that she was working for Empire in November 2010 when the

accident occurred.  (R. 194-97.)  A Detailed Earnings Query and a Summary Earnings Query

generated in December 2014 reflect Plaintiff's earnings as follows:

| Year | Employer | Earnings |
|------|----------|----------|
| 2010 | All Zone | $1,440 |
|      | Empire | $4,343 |
|      | Central Parking | $206 |
|      | Self-Employment | $2533 |
|      |          | $8,522 |
| 2011 | Empire | $219 |
|      | Self-Employment | $11,712 |
|      |          | $11,931 |
| 2012 | Self-Employment | $10,139 |
| 2013 | Self-Employment | $13,719 |

(R. 207-212.)[8]

## V.    DISCUSSION

At Step One, the ALJ found that, because Plaintiff engaged in substantial gainful activity

between January and December 2013, the decision would "address the period(s) the claimant did

not engage in substantial gainful activity."  (R. 15.)  The relevant time periods for the ALJ's

consideration were November 4, 2010 (alleged onset date) through December 31, 2012, and

January 1, 2014 through December 7, 2015 (decision date).

A.    **Step Three.**

The Step Three section of the ALJ's decision reads in its entirety:

The claimant does not have an impairment or combination of impairments that
meets or medically equals the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

---

[8] The annual substantial gainful amount was $12,000 for 2010 and 2011, $12,120 for 2012, and $12,480
for 2013.  *See* https://www.ssa.gov/oact/cola/sga.html.

> A review of the available record reveals no evidence to support a conclusion that the claimant's impairments meet or medically equal any applicable listing, including 1.02 Major dysfunction of a joint and 5.50 Chronic liver disease.

(R. 16.)[9]  Plaintiff's attack is twofold.  First, Plaintiff argues that the ALJ committed reversible error by failing to explain his Step Three finding within this section of the decision.  Second, Plaintiff argues that the ALJ "incorrectly evaluated [her] impairment under Listing 1.02" and committed reversible error by failing to consider Listing 1.06 (Fracture of the femur, tibia, pelvis, or tarsal bone(s)) and Listing 1.08 (Soft tissue injury).[10]  ECF No. 18 at 1; *see* ECF No. 15 at 15 ("Plaintiff's impairments were not evaluated under the proper Listing[.]").  The Court disagrees.

The Third Circuit instructs that the ALJ need not "use particular language or adhere to a particular format in conducting analysis" so long as "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any [L]isting."  *Jones*, 364 F.3d at 505 ("the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review"); *see Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008) (ALJ need not mention any specific Listing to make judicially reviewable finding); *Lopez v. Comm'r of Soc. Sec.*, 270 F. App'x 119, 121-22 (3d Cir. 2008) ("An ALJ's failure to discuss specific Listing is not a reversible error if [s/]he analyzed all the probative evidence and explained [her/]his decision sufficiently to permit meaningful judicial review."); *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146-47 (3d Cir. 2007) (ALJ's "fail[ure] to identify the listing that came closest to

---

[9] The Court analyzes all Listing criteria, as did the ALJ, in effect on December 7, 2015, the date of the ALJ's decision.  The applicable criteria are described in Social Security Administration Program Operations Manual System ("POMS") DI 34121.011, *Musculoskeletal Listings from 06/16/2008 to 09/28/2016*, available at http://policy.ssa.gov/poms.nsf/lnx/0434121011; and POMS DI 34125.009, *Digestive Listings from 12/18/07 to 1/16/17*, available at http://policy.ssa.gov/poms.nsf/lnx/0434125009.

[10] Plaintiff does not dispute the ALJ's finding as to Listing 5.05 (Chronic liver disease).

matching [claimant's] impairments" was not reversible error where ALJ "clearly evaluated the medical evidence") (all citing *Jones*).  Thus, the Court must determine whether the evidentiary discussion – regardless of its placement in the ALJ's decision – supports a finding of not disabled at Step Three – regardless of whether the ALJ's decision even cites to a Listing – pursuant to the applicable legal standards.  The Court finds that the Step Four section of the ALJ's decision adequately analyzes the evidence relevant to Listings 1.06 and 1.08, even though those Listings are not cited in the decision.

### 1.    Listing 1.06.

Listing 1.06 requires a fracture of the femur, tibia, pelvis, or one or more of the tarsal bones, and:

> A.  Solid union not evident on appropriate medically acceptable imaging and not clinically solid;
>
> AND
>
> B.  Inability to ambulate effectively, as defined in 1.00B2b, *and return to effective ambulation did not occur or is not expected to occur within 12 months of onset*.

POMS DI 34121.011 (emphasis added).  There is no dispute that, on November 4, 2010, Plaintiff satisfied the threshold and paragraph A criteria because x-rays confirmed that Plaintiff had a fractured tibia and fibula in her right leg and was unable to ambulate effectively.  On January 17, 2012, Dr. Oppenheim opined that Plaintiff's fractures had healed.  Plaintiff does not cite – and the Court has no identified – any conflicting evidence in this regard.  Nor is there evidence that Plaintiff had a new fracture of her femur, tibia, pelvis, or tarsal bone(s) at any time between January 18, 2012 and December 7, 2015.  Thus, the dispositive issue as to both time periods before the ALJ is whether Plaintiff was still unable to ambulate effectively by November 4, 2011 and thus satisfied the paragraph B criteria.  Under Listing 1.00B2b, "[i]neffective ambulation is defined

generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." *Id.* (emphasis added).[11]  Dr. Liporace prescribed a cane in April 2011.  Dr. Oppenheim reported in September, October, and November 2011 that Plaintiff was ambulating without the cane.  The Court addresses in Section V.C. below Plaintiff's claim that she *continues* to require the cane for effective ambulation.  But any such continued need is not relevant to the Listing 1.06 analysis, because Plaintiff points to no evidence demonstrating that using the cane limits the function of *both* of her arms.  (Indeed, Dr. Vekhnis opined that Plaintiff had effective use of at least one upper extremity for carrying when she used the cane.)  The ALJ cited Dr. Oppenheimer's treatment records, and Plaintiff does not cite – nor has the Court identified – any conflicting evidence regarding Plaintiff's ability to ambulate effectively by September 2011 or any time thereafter.  The Court therefore finds that substantial evidence does not support a finding that Plaintiff satisfied Listing 1.06.

### 2.    Listing 1.08.

Listing 1.08 requires:  (a) soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head; *and* (b) such injury is under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function; *and* (c) such major function was not restored or expected to be restored within 12 months of onset.  POMS DI 34121.011.  Listing 1.00M provides:

> Under continuing surgical management, as used in 1.07 and 1.08, refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part.  It may include such

---

[11] Listing 1.00B2b includes the word "generally" because "Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of hand." POMS DI 34121.011.  Listing 1.00J requires an examination of the claimant's ability to ambulate without the assistive device(s) in place.  *See id.*

> factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy. When burns are not continuing surgical management, *see* 8.00F.

*Id.*[12] There is also no dispute that, on November 4, 2010, Plaintiff had bilateral soft tissue injuries of her legs that were under continuing surgical management directed toward the restoration of her ambulatory function. Dr. Capo treated Plaintiff's soft tissue injuries when she was released from the hospital in November 2010. There are no treatment records from Dr. Capo. In March 2011, Plaintiff advised Dr. Liporace (who treated her bone injuries) that she had been discharged from Dr. Capo's care. Dr. Oppenheim's treatment records consistently indicate that Plaintiff's skin graft and rotation flap were maintained without breakdown. (R. 503-16.) Plaintiff does not cite – and the Court has no identified – any conflicting evidence in this regard. Nor is there evidence that Plaintiff had a new soft tissue injury of her upper or lower extremity, trunk, or face that required surgical treatment at any time between March 2011 and December 7, 2015. Thus, the dispositive issue as to both time periods before the ALJ is whether Plaintiff's ambulatory function was restored by November 4, 2011. As explained above, Plaintiff was able to ambulate effectively by September 2011 and remains able to do so today.[13] The Court therefore finds that substantial evidence does not support a finding that Plaintiff satisfied Listing 1.08.

---

[12] Listing 8.00F applies to burns that do not meet the requirements of Listing 1.08 but meet the requirements for extensive skin lesions under Listing 8.00C1 (i.e., "those that involve multiple body sites or critical body areas and result in a very serious limitation"). POMS DI 34128.011, *Skin Listings from 06/16/08 to 01/16/17*, available at http://policy.ssa.gov/poms.nsf/lnx/0434128011.

[13] For the same reasons – and assuming solely for purposes of this opinion that appropriate medically acceptable imaging document joint space narrowing, bony destruction, or ankylosis of Plaintiff's hip, knee, or ankle – the Court finds that substantial evidence supports the ALJ's finding that Plaintiff did not satisfy Listing 1.02 during the relevant periods. *See* POMS DI 34121.011.

B.    **Step Four – Plaintiff's Subjective Symptoms.**

At Step Four, the ALJ assessed Plaintiff's subjective symptoms pursuant to the two-step process set forth in Social Security Ruling 96-7p.  *See* SSR 96-7p, *Policy Interpretation Ruling Titles II & XVI:  Evaluation of Symptoms in Disability Claims:  Assessing the Credibility of an Individual's Statements*, 1996 WL 374186 (S.S.A. Jul. 2, 1996).[14]  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision."  (R. 16-17.) The ALJ explained:

> Regarding the claimant's credibility, I find her to be partially credible.  While the claimant testified that she is in a continued state of severe pain, she also stated to the consultative examiner that she only takes Tylenol on an as needed basis and demonstrated that she could ambulate without an assistive device.  Also, although her application for disability is based on her alleged inability to perform work related activities, she indicated that she does perform personal care activities without difficulty, chores around the home, like cooking, laundry, and shopping. She is able to travel out for dinner and participate in public activities, like church. Such inconsistency and selectivity suggests that the claimant's symptoms are not as severe as she alleges.

(R. 17.)  Plaintiff contends that the ALJ committed reversible error in assessing her subjective symptoms.  Specifically, Plaintiff argues that the ALJ erred by considering her daily activities. Plaintiff also argues that the ALJ erred by considering her conservative treatment because she testified both that "her medications did not help much and caused more fatigue" and that she "is without medical insurance since she has been unemployed."  ECF No. 18 at 5.

The Court rejects Plaintiff's blanket assertion that an ALJ can never consider daily activities when assessing a claimant's subjective symptoms.  *See* 20 C.F.R. §404.1529(c)(3)(i);

---

[14] Although Social Security Ruling 96-7p has been superseded, the Ruling still applies to decisions that were made prior to March 28, 2016.

*Burns*, 312 F.3d at 129-30.  However, the Court agrees that Plaintiff's ability to engage in the specific activities cited by the ALJ are not inconsistent with her symptoms.  Cooking or going out to dinner, for example, do not require Plaintiff to sit for more than 2 hours.  The Court nevertheless finds that such error is harmless.  The ALJ noted that Dr. Oppenheimer cleared Plaintiff in October 2011 to return to work as a driver on "light" duty, meaning that she could not be on her feet for more than 2 hours a day.  Plaintiff told Dr. Oppenheim in November 2011 that she was driving on a part time basis.  (R. 18.)  But Plaintiff's earnings for 2011 were just shy of the $12,000 substantial gainful activity amount and indicate that Plaintiff was not as limited during that year as she alleges.  Similarly, Plaintiff's earnings in 2012 after she was cleared by Dr. Oppenheim to return to work as a driver with no limitations were also close to the substantial gainful activity amount for that year.  As the ALJ found, Plaintiff's earnings in 2013 exceeded the substantial gainful activity amount and conclusively demonstrate that Plaintiff was *not* disabled for that year.   (R. 15.) Plaintiff testified that she continued to work 12 hours a week until early 2015 when she stopped because of pain.  Plaintiff's ability to work at this level demonstrates that her symptoms are not nearly as limiting as stated.  *Cf.*  20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.")

The Court also finds that the ALJ did not err by considering Plaintiff's conservative treatment history.  Plaintiff's characterizations of her testimony in this regard are inaccurate.  When asked by the ALJ which of her medications she thought caused fatigue, Plaintiff responded:  "I think it's just the pain that I'm having.  The fatigue comes from me trying to walk – trying to get around."  (R. 45-46.)  Plaintiff also testified that her insurance "kicked in" in February or March 2015, and since that time, she sought treatment from Dr. Taylor (for hepatitis), Dr. Homb (for pain management), and an unnamed primary care physician (for unspecified "other issues").  The ALJ

hearing occurred in December 2015.  Plaintiff submitted six months of treatment notes from Dr. Taylor (May to November 2015).  Plaintiff reported during every appointment with Dr. Taylor that her pain was 0 on a 10-point scale.  Although she intermittently complained of some joint pain, the complaints Plaintiff articulated to Dr. Taylor were nowhere near the degree that she now claims.  The same applies to the complaints Plaintiff articulated during physical therapy (September to November 2015).  Plaintiff submitted no records from Dr. Homb or any other physician that support her statements concerning the intensity, persistence and limiting effects of her symptoms in 2015.  As for prior periods, Plaintiff's lack of insurance did not prevent her, as noted above, from engaging in substantial gainful activity in 2013 and significant gainful activity before and after.

       C.      **Step Four – RFC Finding.**

Also at Step Four, the ALJ found that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except no climbing of ladders, ropes, or scaffolds.  She can occasionally balance, stoop, kneel, crouch[,] crawl, and climb stairs/ramps." (R. 16.)  Sedentary work generally involves lifting/carrying no more than 10 pounds at a time, standing or walking no more than 2 hours in an 8-hour workday, and sitting approximately 6 hours in an 8-hour workday.  *See* 20 CFR § 404.1567(a); Social Security Ruling 83-10, *Titles II & XVI: Determining Capability To Do Other Work – The Medical-Vocational Rules Of Appendix 2*, 1983 WL 31251, at *5 (S.S.A. 1983).  Plaintiff contends that the ALJ committed reversible error because the RFC finding:  (1) "is simply conclusory and does not contain any rationale or reference to the supporting evidence;" and (2) "fail[s] to focus on the plaintiff's ability to sustain work activities." ECF No. 15 at 18.  Specifically, Plaintiff argues that the RFC finding does not include all credibly established limitations because "[t]o expect an individual to kneel, crouch or crawl on a knee that

is stabilized by internal hardware is unconscionable," and because Plaintiff uses a cane.  ECF No.

18 at 5.  The Court disagrees.

First, neither Plaintiff's counsel, the ALJ, nor this Court is qualified to conclude that

claimants with "internal hardware" in their knees can *never* kneel, crouch, or crawl.  No physician

has opined that Plaintiff is so limited:  Dr. Oppenheim cleared Plaintiff in January 2012 for return

to work as a driver without any limitations; Dr. Vekhnis reviewed x-rays of Plaintiff's leg and

noted the "internal hardware" but did not opine that Plaintiff had any postural limitations; and the

State Agency reviewing consultants unanimously agreed that Plaintiff could occasionally kneel,

crouch, or crawl.  Moreover, the DOT expressly indicates that *none* of the jobs identified by the

VE requires kneeling, crouching, or crawling.  *See* DICOT 205.367-030, 1991 WL 671719

(election clerk); DICOT 209.587-010, 1991 WL 671797 (address clerk); DICOT 249.587-018,

1991 WL 672349 (document clerk) (each noting "Kneeling:  Not Present – Activity or condition

does not exist"); "Crouching:  Not Present – Activity or condition does not exist"); and "Crawling:

Not Present – Activity or condition does not exist.").  The Court therefore finds that substantial

evidence supports the RFC limitation to occasional kneeling, crouching, and crawling, and

alternatively, that any error as to these three postural limitations was harmless.

Second, the ALJ was required to consider Plaintiff's cane in crafting the RFC finding only

if the device was medically required.  As instructed in Social Security Ruling 96-9p:

> To find that a hand-held assistive device is medically required, there must be
> medical documentation establishing the need for a hand-held assistive device to aid
> in walking or standing, and describing the circumstances for which it is needed (i.e.,
> whether all the time, periodically, or only in certain situations; distance and terrain;
> and any other relevant information).  The adjudicator must always consider the
> particular facts of a case.

SSR 96-9p, *Titles II & XVI:  Determining Capability To Do Other Work – Implications Of A*

*Residual Functional Capacity For Less Than A Full Range Of Sedentary Work*, 1996 WL 374185,

at *7 (S.S.A. Jul. 2, 1996); *see Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (insufficient evidence that physician-prescribed cane was medically required absent physician's discussion of medical necessity) (citing S.S.R. 96-9p). In March 2011, Dr. Liporace "prescribed a walking cane to assist with ambulation" after Plaintiff reported that she had been discharged from Dr. Kaufman for illicit drug use and was only doing home therapy because of her pain level. In September and October 2011, Dr. Oppenheim reported that Plaintiff was no longer using the cane. He cleared her in October 2011 to resume light duty work, and in January 2012 to resume work without limitation, absent any reference to a hand-held assistive device. In 2013, Plaintiff walked into Dr. Vekhnis's office using a cane but was also able to walk in the office without using it. Dr. Vekhnis opined that Plaintiff "benefitted" from the cane, noting that it had been prescribed for Plaintiff to lean on as support during long walks. There is no record evidence of any such prescription. Dr. Thomas's 2015 treatment notes, which consistently report Plaintiff's normal gait, do not indicate that Plaintiff was using the cane. Although the physical therapist noted during a September 2015 initial evaluation that Plaintiff had a mild antalgic gait, it was also noted that Plaintiff ambulated independently without an assistive device. Based on this record, the Court finds that substantial evidence supports the ALJ's exclusion of Plaintiff's use of a cane from the RFC finding. *See Rodriguez v. Comm'r of Soc. Sec.*, No. 16-cv-02807 (SDW), 2017 WL 935442, at *7-8 (finding same where treatment record did not explain why prescribed cane was medically necessary, treatment notes reported normal gait, and Plaintiff was able to walk without cane).[15]

---

[15] Social Security disability benefits may be awarded for a "closed period" if a once-disabling condition lasting for at least twelve months ceases to be disabling. 20 C.F.R. §404.1509. Plaintiff did not argue before the ALJ or the Appeals Council that she was entitled to a closed period of DIB because she was disabled at least as of November 4, 2011 – twelve months after her accident and alleged onset date. Nor did she raise the argument in this Court. *See* ECF No. 18 at 5 ("Defendant implies that these severe injuries no longer exist[]. This is simply not true. While her crush injuries were tended to at the time of the accident, she still has the residuals of this horrible accident."). The Court therefore finds that the argument has been

## VI.    CONCLUSION

For the reasons explained in this Opinion, the Court affirms the Commissioner's decision that Plaintiff was not disabled as set forth in the accompanying Order.


Dated:  April 25, 2019                          _____s/ Paul A. Zoss_____
At Newark, New Jersey                    PAUL A. ZOSS, U.S.M.J.

---

waived.  *See Jimenez v. Barnhart*, 46 F. App'x 684, at *1 (3d Cir. Sep. 17, 2002) (claimant waived argument that she is entitled to closed period of disability when argument raised for first time in objections to Magistrate Judge's Report & Recommendations).  The Court observes that Dr. Oppenheim cleared Plaintiff in October 2011 to return to "light duty" work, instructing that she not stand or walk more than 2 hours in an 8-hour day and not ambulate with more than 20 pounds.  Thus, Dr. Oppenheim's opinion of Plaintiff's functional ability *11 months* after the accident was *less* restrictive than the decisional RFC pursuant to which Plaintiff was found not disabled.  The Court further observes that, notwithstanding that she was not cleared to return to work in any capacity prior to October 2011, Plaintiff's earnings for 2011 were just shy of the substantial gainful activity amount.